# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re | Jointly Administered Under Case No. 08-45257 |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| Debtors. | Court File Nos.: |

| (includes: | |
|---|---|
| Petters Group Worldwide, LLC; | 08-45258 |
| PC Funding, LLC; | 08-45326 |
| Thousand Lakes, LLC; | 08-45327 |
| SPF Funding, LLC; | 08-45328 |
| PL Ltd., Inc.; | 08-45329 |
| Edge One LLC; | 08-45330 |
| MGC Finance, Inc.; | 08-45331 |
| PAC Funding, LLC; | 08-45371 |
| Palm Beach Finance Holdings, Inc.) | 08-45392 |

Chapter 11 Cases
Judge Kathleen H. Sandberg

---

Douglas A. Kelley, in his capacity as the Trustee of the PCI
Liquidating Trust,

Plaintiff,                    Adv. Proc. No. _____

v.

Greenpond South, LLC; Stonehill Master Fund Ltd.;
PB Offshore Holdings LTD; Michael Lenard Stern;
and Geoffrey Varga,

Defendants.

---

## COUNTERCLAIM TO CLAIM NO. 103
## AND COMPLAINT FOR RELIEF

Plaintiff, Douglas A. Kelley ("<u>Kelley</u>," the "<u>Chapter 11 Trustee</u>" or "<u>PCI Trustee</u>"), as the Liquidating Trustee of the PCI Liquidating Trust in the chapter 11 cases of the above-captioned debtors (collectively the "<u>Debtors</u>"), for his counterclaims and claims against PB Offshore Holdings, LTD ("<u>Offshore</u>"), Stonehill Master Fund Ltd. ("<u>Stonehill</u>"), Greenpond South, LLC ("<u>Greenpond</u>"), Michael Lenard Stern ("<u>Stern</u>"), and Geoffrey Varga ("<u>Varga</u>," and together with Offshore, Stonehill, Greenpond, and Stern, "<u>Defendants</u>"), states and alleges:

## <u>NATURE OF THE ACTION</u>

1.      This is an action arising from shameless and deceitful conduct necessitating extraordinary relief.

2.      Having obtained membership on the Petters Company, Inc. ("<u>PCI</u>") Chapter 11 Unsecured Creditors Committee (the "<u>UCC</u>") in 2013, Stern and Greenpond, the company he controlled, were fiduciaries to the Debtors' bankruptcy estates (the "<u>PCI Estates</u>").

3.      Their membership on the UCC also gave Stern and Greenpond access to non-public information about these estates, which information was to be used solely for the benefit of the victims of the Petters Ponzi scheme.

4.      Stern and Greenpond were not victims of the Petters Ponzi scheme.  Rather, Stern, through Greenpond, purchased the $141 million allowed claim of Acorn Capital Group, LLC ("<u>Acorn</u>") against PCI (the "<u>Acorn Claim</u>").

5.      Stern's and Greenpond's acquisition of the Acorn Claim was their entrée onto the UCC.

6.      Having obtained positions of trust, Stern and Greenpond abused that trust, misused nonpublic information to which they had access, and breached their fiduciary duties.

7.      Stern's and Greenpond's deceitful behavior and patent violation of their fiduciary duties came about from Stern's acquisition of a participation interest in the claims owned by Varga.

8.      Varga, as a Cayman Island liquidator, owned two claims: one against the bankruptcy estate of a fund in Florida (the "PBF II Estate") for $720 million lent and lost to Palm Beach Finance II, LP ("PBF II"), and the other against the PCI Estates for that same $720 million (the "Varga Claim").   The trustee appointed in the bankruptcy case of PBF II and its affiliate also asserted a claim against the PCI Estates for that same $720 million loss (the "PBF II Claim").   Varga expressly labeled his claim in *this* estate as having been filed "out of an abundance of caution," because it would have duplicated his claim against the PBF II Estate (which was later allowed in full) if the PBF II Claim were allowed in full against the PCI Estates.

9.      In 2013, after Stern and Greenpond were appointed to the UCC, Stern, using another fund he controlled—Stonehill—purchased a participation interest in Varga's claims. Varga continued to hold title to those claims.

10.      Through a series of deceitful actions, misrepresentations, and material omissions, Stern, in breach of his fiduciary duties, led the other members of the UCC, the PCI Trustee, the U.S. Trustee for the District of Minnesota, this Court, and the true victims of the Petters fraud to believe and act on the belief that the Varga Claim against the PCI Estates was worthless and would receive no distribution whatsoever out of the PCI Estates, since it would duplicate Varga's allowed claim against the PBF II Estate, once the PBF II Claim was allowed against the PCI Estates.

11.     After the other members of the UCC, the PCI Trustee, and the true victims of the Petters fraud innocently acted to their substantial detriment on the belief the Varga Claim against the PCI Estates would receive no distribution, Stern and Varga revealed their fraudulent intent.

12.     Contrary to their express actions, representations, and material omissions that led everyone to believe the Varga Claim against the PCI Estates was worthless, Stern, having gained a significant advantage and in breach of his fiduciary duties, with Varga's aid and assistance, actively pursued the Varga Claim against the PCI Estates, seeking recovery of the $720 million they previously had represented to be duplicative and worthless.

13.     Because of Defendants' breach of trust and deceitful conduct, Plaintiff Trustee seeks equitable subordination of the portion of the Acorn Claim not assigned to Interlachen Harriet Investments Limited (the "Unassigned Acorn Claim")[1] and the entirety of the Varga Claim under 11 U.S.C. § 510(c), disallowance of the Unassigned Acorn Claim under 11 U.S.C. § 502(j), rescission of interim payments made to Greenpond, damages arising out of Stern's and Greenpond's breaches of fiduciary duty, damages arising of Stern's aiding and abetting of Greenpond's breaches of fiduciary duty, damages arising out of Varga's aiding and abetting of Stern's and Greenpond's breaches of fiduciary duty, and payment of attorney fees and costs.

## JURISDICTION AND VENUE

14.     This adversary proceeding is commenced pursuant to §§ 105, 502(j) and 510(c) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1] As set forth in the Factual Background section, a portion of the Acorn Claim was assigned to Interlachen Harriet Investments Limited ("Interlachen"). This lawsuit does not seek to equitably subordinate, disallow, or otherwise impact Interlachen's interest in the Acorn Claim.

15.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1332, 1334, and 1367.

16.     This is a core proceeding pursuant to 28 U.S.C. § 157.   This Court has constitutional authority to enter a final order on all claims alleged.   To the extent it does not, Plaintiff consents to the Court entering such final order.

17.     Venue lies properly in this district pursuant to 28 U.S.C. § 1409(a) because this adversary proceeding arises in or is related to the chapter 11 cases of the Debtors (the "Chapter 11 Cases" or the "PCI Bankruptcy Cases").   Venue in this district is also proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim arose in this district.

## THE PARTIES

18.     Douglas A. Kelley is the Liquidating Trustee of the PCI Liquidating Trust.   He previously served as the Chapter 11 Trustee of the PCI and Petters Group Worldwide, LLC ("PGW") chapter 11 bankruptcy estates.

19.     PB Offshore Holdings, LTD is a fund managed by Stonehill Capital Management, LLC ("Stonehill Management") and is an exempted company organized under the laws of the Cayman Islands whose principal places of business is George Town, Grand Cayman, Cayman Islands.   Offshore is the current owner of Claim Nos. 64 in the chapter 11 case of PGW and 103 in the chapter 11 case of PCI—collectively, the Varga Claim.

20.     Stonehill Master Fund Ltd. is an exempted company organized under the laws of the Cayman Islands whose principal place of business is in New York, New York and is a fund managed by Stonehill Management.

21.     Greenpond South, LLC is a limited liability company organized under the laws of the State of Delaware and a fund managed by Stonehill Management.   Greenpond is the successor-in-interest to several funds, including Acorn, and is the holder of the Acorn Claim. Greenpond was, at times relevant to this action, a non-voting member of the UCC in these Chapter 11 Cases and serves as a member of the PCI Liquidating Trust Committee (the "Trust Committee") organized under the Second Amended Chapter 11 Plan of Liquidation [D.E. 3263] (the "PCI Plan").   Greenpond's principal place of business, on information and belief, is New York, New York.

22.     The following creditors served as members of the UCC with Greenpond: Ronald Peterson (the "Lancelot Trustee"), the chapter 7 trustee appointed over the Lancelot Bankruptcy Cases (as defined below); Barry Mukamal (the "PBF Trustee"), the chapter 11 trustee and subsequent liquidating trustee appointed in the PBF Bankruptcy Cases (as defined below); and Interlachen.

23.     The following individuals serve as members of the Trust Committee with Greenpond: Ronald Peterson, as the Lancelot Trustee; Barry Mukamal, as the PBF Trustee; Lance Breiland, as Interlachen's representative; and Charles Cremens.

24.     Stern is an individual residing in Manhattan, New York, New York.   At all relevant times, Stern either was employed by or served as a member of Stonehill Management. Stern manages and controls Greenpond and Stonehill.   He was and is Greenpond's delegate to the UCC and the Trust Committee and was also Greenpond's representative as a plan proponent of the PCI Plan.

25.     Varga is an individual residing in Randolph, New Jersey.   He is the official liquidator in the insolvency proceedings before the Grand Court of the Cayman Islands of two

Cayman entities, Palm Beach Offshore, Ltd. and Palm Beach Offshore II, Ltd. (collectively, the "Offshore Funds").  Varga is also an appointed trust monitor in the chapter 11 case of PBF II, which is pending before the United States Bankruptcy Court for the Southern District of Florida ("PBF Bankruptcy Court") together with the chapter 11 case of Palm Beach Finance Partners, LP ("PBF I," and together with PBF II, the "PBF Funds") captioned as *In re Palm Beach Finance Partners, L.P.*, Case No. 09-36379 (Bankr. S.D. Fla.) (jointly administered) (the "PBF Bankruptcy Cases").  Varga is also a liquidator in the chapter 7 case of Lancelot Investors Fund LTD and its affiliated debtors (collectively, "Lancelot") pending before the United States Bankruptcy Court for the Northern District of Illinois captioned as *In re Lancelot Investors Fund, L.P., et al.*, Case No. 08-B-28225 (the "Lancelot Bankruptcy Cases").  Varga is the signatory to the Varga Claim and originally was the 100% interest holder of the Varga Claim.

## FACTUAL BACKGROUND

### I.    THE CHAPTER 11 CASES.

26.    Thomas Petters operated a massive Ponzi scheme through PCI and related entities.

27.    On October 6, 2008, the United States District Court, District of Minnesota appointed Kelley as receiver for PCI and related entities.  Kelley filed petitions commencing the chapter 11 cases of PCI and PGW on October 11, 2008.

28.    Thereafter, Kelley filed petitions commencing the chapter 11 cases of PC Funding, LLC, Thousand Lakes, LLC, SPF Funding, LLC, PL Ltd., Inc., Edge One LLC, MGC Finance, Inc., PAC Funding, LLC and Palm Beach Finance Holdings, Inc.[2]

---

[2] Palm Beach Finance *Holdings*, Inc. is a debtor in these Chapter 11 Cases and should not be confused with Palm Beach Finance *Partners*, L.P. or Palm Beach Finance II, L.P., the entities

29.    On December 24, 2008, the United States Trustee's office for this District (the "US Trustee") appointed Kelley as the chapter 11 trustee and this Court approved that appointment.

30.    On April 15, 2016, the Court entered the Confirmation Order confirming the PCI Plan proposed by the Chapter 11 Trustee, Greenpond, the Lancelot Trustee, and the PBF Trustee (collectively, the "Plan Proponents").

## II.    THE OFFSHORE FUNDS AND THE PBF FUNDS.

### A.    The Facts Underlying The Filing Of The Varga Claim.

31.    This lawsuit arises from the Varga Claim.  Three groups were connected to the Varga Claim: (a) the PBF Funds, (b) the Offshore Funds, and (c) the Debtors.  The PBF Funds were created to lend money to PCI, which Petters used to fund his massive fraud.  PBF II raised the money to lend to PCI by selling limited partnership stakes to third parties or by borrowing money from its two offshore lenders, the Offshore Funds.  The PBF Funds' loans to the Debtors are evidenced by promissory notes (the "PBF Notes").

32.    Unlike the PBF Funds, the Offshore Funds made no loans to the Debtors and the Offshore Funds are not holders of any notes issued by the Debtors.  Rather, the Offshore Funds lent money to PBF II.  In return, PBF II issued promissory notes to the Offshore Funds (the "Offshore Notes"), which evidence loans totaling over $578 million.

33.    Ultimately, the PBF Funds and the Offshore Funds toppled into insolvency proceedings in connection with the collapse of the Petters entities.

---

that filed for chapter 11 relief before the United States Bankruptcy Court for the Southern District of Florida.

34.     The Offshore Funds were placed into liquidation proceedings on November 8, 2008 before the Grand Court of the Cayman Islands and Varga was appointed liquidator.

35.     The PBF Funds filed the PBF Bankruptcy Cases on November 30, 2009.  The PBF Trustee was appointed to oversee the administration of the chapter 11 estates of the PBF Funds (the "PBF Estates") and to pursue causes of action, including causes of actions and claims against the PCI Estates for the benefit of all creditors and interest holders of the PBF Funds, such as the Offshore Funds.

36.     Before filing for bankruptcy, on April 22, 2009, the PBF Funds filed proofs of claim in the PCI Bankruptcy Cases based on both contract (i.e., the PBF Notes) and tort (fraud). (Claim Nos. 35, as amended (the "PBF I Claim," together with the PBF II Claim, the "PBF Claims"), and 36, as amended (the PBF II Claim), copies of which are attached as Exhibit A.)

37.     On March 15, 2010, the PBF Trustee amended the PBF Claims to evidence he held the PBF Claims as trustee for the PBF Estates.  (*See* Ex. A at 7-12 (PBF I Claim) and 18-23 (PBF II Claim).)

38.     In October 2010, the PCI Trustee objected to the PBF Claims pursuant to § 502(d) of the Bankruptcy Code and their allowance was, by no means, a foregone conclusion.

39.     The PCI Trustee asserted similar objections to the Lancelot Trustee's claims.

40.     Even though the Offshore Funds loaned no money to the Debtors, on December 28, 2009, Varga as liquidator, filed the Varga Claim in these Chapter 11 Cases (copies of which are attached as Exhibit B).

41.     The Varga Claim comprises two identical claims for amounts in excess of $720 million due and outstanding under the *Offshore Notes* (i.e., the notes issued by *PBF II*).

42.   Specifically, the Varga Claim provides that "[d]espite demand by the PB Offshore Funds for payment of the Notes, *Palm Beach Finance* has failed to pay all sums due under the Notes . . . ."  (Ex. B at 3, 7 (Attachment to Proof of Claim of Geoff Varga, In His Capacity As Joint Official Liquidator of Palm Beach Offshore Limited and Palm Beach Offshore II Limited), emphasis added.)

43.   The Varga Claim further provides that "[b]ecause of the fraud alleged in connection with each of these bankruptcies, and the fact that many facts are unknown to creditors such as the Liquidator, *this proof of claim is made out of an abundance of caution . . . ."* (*Id.*, emphasis added.)

44.   Although the Varga Claim references possible "representations, omissions, or actions by one or more of the Debtors that resulted in damages to the PB Offshore Funds" (*id.* at 2), the Varga Claim does not allege that these "representations, omissions, or actions" were made to the Offshore Funds.

45.   The Varga Claim has never been amended.

**B.   Varga Agrees To Forego Pursuit Of Claims Against Third Parties Under PBF Plan In PBF Bankruptcy Cases.**

46.   As liquidator of the Offshore Funds, Varga and his counsel met with the PBF Trustee and his counsel shortly after the PBF Trustee's appointment in early February 2010.

47.   During this meeting and at later meetings and discussions, Varga expressed to the PBF Trustee his views on how the PBF Estates could pursue recoveries that would benefit the Offshore Funds and the other creditors and interest holders of the PBF Funds.

48.   Varga and the PBF Trustee specifically discussed that the Offshore Funds' recovery would be channeled through the PBF II Estate primarily via two sources: (a) assets

derived from the PBF Trustee's pursuit of clawback and other litigation; and (b) the distribution the PBF Trustee would receive from the PCI Estates on account of the PBF II Claim.

49.     On April 6, 2010, Varga as liquidator of the Offshore Funds filed proofs of claim against the PBF II Estate (Claim Nos. 15 and 16 in PBF Bankruptcy Cases (the "Offshore PBF Claims"), copies of which are attached as Exhibit C).  The Offshore PBF Claims are predicated on PBF II's inability to pay the Offshore Notes, for which at least $734 million was outstanding.

50.     On June 8, 2010, Varga and his counsel, Edward Estrada, and the PBF Trustee and his counsel, Michael Budwick, met with the Chapter 11 Trustee and his counsel, Daryle Uphoff and James Lodoen, at the offices of Kelley, Wolter & Scott, P.A. in Minneapolis, Minnesota.

51.     During that meeting, Varga communicated to Lodoen that he filed the Varga Claim out of an abundance of caution and that he would either withdraw or voluntarily dismiss the Varga Claim once the PBF II Claim in the PCI Bankruptcy Cases was allowed.  Lodoen stated the allowance of the PBF II Claim would not be addressed until much later in the PCI Bankruptcy Cases.

52.     On September 3, 2010, the PBF Trustee *and* Varga submitted the *Second Amended Joint Plan of Liquidation of Barry Mukamal, as Chapter 11 Trustee of Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P., and Geoffrey Varga, as Joint Official Liquidator for Palm Beach Offshore, LTD. and Palm Beach Offshore II, LTD.* [D.E. 245 in PBF Bankruptcy Cases] (the "PBF Plan," a copy of which is attached as Exhibit D).  The PBF Trustee and Varga also submitted a joint Disclosure Statement [D.E. 246 in PBF Bankruptcy Cases].

53.     The Offshore PBF Claims were allowed in the PBF Bankruptcy Cases per the PBF Plan for the unpaid principal balance and all accrued note interest.  The PBF Plan provided

that the Offshore PBF Claims would "not be subject to dispute, challenge or reduction in amount by any party-in-interest . . . ."  (Ex. D at 45 (PBF Plan, Art. 8.3).)

54.     Varga also secured additional benefits on behalf of the estates of the Offshore Funds (the "Offshore Estates") under the PBF Plan:

a.      Varga was appointed as a "Trust Monitor" over the PBF II Estate, which provided him a significant role in the management of the PBF Bankruptcy Cases.

b.      For his services as Trust Monitor, Varga's employer Kinetic Partners (Cayman) Ltd. has been paid over $1.6 million and three law firms (located in Miami, New York and Cayman Islands) representing Varga have been paid over $2.2 million from the PBF Estates.

c.      Varga received a disproportionate allocation of certain litigation proceeds (i.e., the "Kaufmann Rossin Settlement Payment," as defined in the PBF Plan), which resulted in an immediate cash payment to him (as liquidator of the Offshore Estates) of nearly $6 million.

d.      Varga was granted the right to "veto" any settlement agreements between the PBF Trustee and any third party regarding the PBF II Claim or PBF II's retention of professionals.

e.      The PBF Trustee agreed not to object to a substantial contribution claim filed by Varga and his professionals under 11 U.S.C. § 503(b)(3).  Varga's substantial contribution claim was allowed in an amount of over $800,000.

55.     Although Varga served as a Trust Monitor for only the PBF II Estate, because both PBF Estates jointly held third party tort claims, Varga wielded substantial control over the administration of the PBF I bankruptcy estate as Trust Monitor.

56.     To ensure Varga would be provided access to privileged, confidential, and non-public information and strategies held by the PBF Estates as they related to both third party litigation claims and the PCI Bankruptcy Cases, the PBF Plan provided that any communications between the PBF Trustee and the Trust Monitor would be protected under a common interest privilege.

57.     Nowhere in the PBF Plan, the related court-approved disclosure statement, or in his Bankruptcy Rule 2014 disclosures, did Varga state an intent, as would otherwise be required, to pursue a competing claim in the PCI Bankruptcy Cases that would materially dilute the value of distributions to the PBF Estates to which he owed fiduciary duties and from which he was being paid.

58.     In exchange for the above consideration, subject to certain non-relevant exceptions, Varga abandoned the pursuit of any and all tort claims on behalf of the Offshore Estates held jointly by the PBF and Offshore Estates.

59.     In lieu of pursuing myriad tort claims that would mostly duplicate, and potentially interfere with, claims the PBF Trustee would bring, Varga agreed to collect the Offshore Funds' recovery from the two sources he had discussed with the PBF Trustee from the outset: (a) assets derived from the PBF Trustee's pursuit of third party litigation; and (b) the distribution the PBF Trustee would receive from the PCI Estates under the PBF II Claim (assuming it was allowed).

60.     The PBF Plan expressly provided that the PBF Trustee (or his successor) "will have the exclusive right to enforce any and all Litigation Claims and rights of the Debtors that arose before or after the Petition Date . . . against potential targets of the Liquidation Claims" (Ex. D at 43-44 (PBF Plan, Art. 8.1)), which included (but was not limited to) claims against the

Petters entities.  (*See, e.g., id.* at 103 (PBF Plan, Schedule 1.1.52) (including PCI, PGW, etc., in schedule of Potential Targets  of Claims to be Pursued by Liquidating Trustee).)

61.      The PBF Bankruptcy Court confirmed the PBF Plan on October 21, 2010.  After its confirmation, the PBF Trustee asserted claims against several third parties, recovering tens of millions of dollars.  Under the PBF Plan, Varga did not initiate tort claims against those parties, as his recoveries would be channeled through the PBF II Estate.

62.      Because Varga was not "competing" with the PBF Estates, the PBF Trustee shared confidential work product with Varga in his role as Trust Monitor, including strategies to ensure allowance of the PBF Claims in the PCI Bankruptcy Cases, since those claims were the subjects of an objection by the PCI Trustee and potential opposition by certain other creditors of PCI.

63.      After the PBF Plan was confirmed, the PBF Trustee retained Varga's New York counsel as his special counsel to pursue significant litigation claims on behalf of the PBF Estates.

**C.      Greenpond Purchases An Allowed Claim Without Obtaining The Chapter 11 Trustee's Consent And Joins The UCC.**

64.      Greenpond is a fund managed by Stonehill Management, a limited liability company of which Stern is a member.  Stonehill Management manages investment funds particularly focusing on distressed investments.

65.      According to Stonehill Management's Firm "Brochure," dated March 30, 2016 (a copy of which is attached as Exhibit E (the "Stonehill Management Brochure")), Stonehill Management "believes that companies experiencing financial or other forms of distress may provide superior investment opportunities because the prices of their securities may be volatile as a result of changing circumstances of importance to investors and pronounced changes in their ownership."  (Ex. E (Stonehill Management Brochure) at 8.)

66.    Stonehill Management has also communicated to its investors that

…one or more members, employees or affiliates of [Stonehill Management] may seek to serve as an official or unofficial creditor committee member or otherwise accept potentially material non-public information.   This kind of involvement in a company's reorganization proceedings and the receipt of material non-public information could result in restrictions on the Funds' ability to buy or sell securities of that company.

(*Id.* at 8-9.)

67.    Stern was, at all times relevant to this action, either an employee or member of Stonehill Management.

68.    Stern managed Greenpond's investments and orchestrated Greenpond's acquisition of the Acorn Claim in 2011.

69.    The assignment of the Acorn Claim to Greenpond required the PCI Trustee's consent.   Notwithstanding such requirement, the Acorn Claim was assigned to Greenpond in December 2011 even though the PCI Trustee had not consented.

70.    The Acorn Claim had been filed in only the bankruptcy case of PCI.

71.    Absent substantive consolidation of PCI and PGW, even if the assignment of the Acorn Claim were allowed, Greenpond's distribution would be sourced exclusively from the assets of the bankruptcy estate of PCI, and not from the PGW bankruptcy estate (which, at the time of confirmation of the PCI Plan, held over $130 million).

72.    In early 2013, Greenpond contacted counsel to the UCC, David Runck, to seek Greenpond's appointment to the UCC.   On March 15, 2013, Greenpond was appointed to the UCC on an *ex-officio* and non-voting basis.

73.    The UCC's by-laws (the "UCC Bylaws," a copy of which is attached as Exhibit F) were amended to reconstitute the UCC to include Greenpond.   According to the UCC Bylaws,

> In the event that any matter under review or consideration by the Committee *may* involve a conflict of interest with respect to any Member, such Member *shall* disclose such potential conflict of which he or she has knowledge . . . .   Consistent with the foregoing, the Member having a conflict of interest shall not have access to summaries, analyses, reports or work product prepared by the professionals of the Committee with respect to the matter in which the conflict of interest exists, except to the extent determined to be appropriate under the circumstances in the discretion of the Committee.

(Ex. F at 4-5 (UCC Bylaws, § 2.7), emphasis added.)

74.    The UCC Bylaws also provide that all information disclosed to or generated by the UCC or its professionals, and all communications between UCC members or their counsel were to be kept confidential.  (*Id.* at 6 (UCC Bylaws, § 4.2).)

75.    Starting in late 2013, Stern continuously served as Greenpond's delegate to the UCC.

### D.    Varga Sells Offshore PBF Claims And Worthless Varga Claim To Stonehill, But Stonehill Never Files Bankruptcy Rule 3001 Notice.

76.    In October 2013, as set forth in greater detail in the *Joint Motion for Approval of Omnibus Supplemental Disclosure Filed by Kinetic Partners (Cayman) Ltd. and Levine Kellogg Lehman Schneider + Grossman LLP, as Consultant and Local Counsel, Respectively, to Geoffrey Varga, Liquidating Trust Monitor for Palm Beach Finance II., L.P.* [D.E. 2118 in PBF Bankruptcy Cases] (the "Joint Motion," a copy of which is attached as Exhibit G[3]) and the attendant *Omnibus Supplemental Disclosure Filed by Kinetic Partners (Cayman) Ltd. and Levine Kellogg Lehman Schneider + Grossman LLP, as Consultant and Local Counsel, Respectively, to*

---

[3] The copy of the Joint Motion attached to this Complaint as Exhibit G contains copies of the following exhibits: Exhibit "1" to the Joint Motion (the Supplemental Disclosure (as defined below)) and Exhibit "A" to the Supplemental Disclosure (the "Participation Agreement"). Exhibit G attached to this Complaint does not contain a copy of Exhibit "B" to the Supplemental Disclosure as it is not directly relevant to this Complaint.

*Geoffrey Varga, Liquidating Trust Monitor for Palm Beach Finance II., L.P.* (the "<u>Supplemental Disclosure,</u>" filed as Exhibit 1 to the Joint Motion and included in Exhibit G attached hereto), Varga entered into a Participation Agreement, granting an undisclosed entity a "substantial interest" in any distribution in the PBF Bankruptcy Cases to Varga. (Ex. G at 9 (Supplemental Disclosure, ¶ 4).) The Participation Agreement was filed as Exhibit "A" to the Supplemental Disclosure. (*See id.* at 12-37.)

77. Varga filed the Joint Motion at the PBF Trustee's insistence. In it, Varga explained that the "Participant" was an "affiliate" of "an *ex officio* member of the" UCC. (*See* Ex. G at 9-10 (Supplemental Disclosure, ¶ 5).)

78. Although the identity of the "Participant" remained redacted in the filed copy of the Participation Agreement, Varga disclosed to the PBF Trustee in the PBF Bankruptcy Cases proceedings that Stonehill, a fund also managed by Stonehill Management, was the Participant.

79. Prior to the Participation Agreement, Stonehill was a passive interest-holder in the Offshore Estates by virtue of Stonehill's acquisition of a significant claim in the liquidation proceedings of the Offshore Estates in 2009.

80. As with Greenpond, Stern managed and controlled Stonehill's investments.

81. Because Stern was instrumental in Stonehill's acquisition of its interest in the Offshore Estates in 2009, he took the lead on negotiating and finalizing the Participation Agreement (which he signed).

82. Besides disclosing the sale of a participation interest in the Offshore PBF Claims, the Participation Agreement sets forth that Varga was selling to Stonehill 100% economic interest in and control over "any claims that [Varga] might have in any related bankruptcies, receiverships or other similar proceedings brought against Petters or any affiliates or entities

related to Petters (the "Petters-Related Claims") . . . ."  (Ex. G at 14-15 (Participation Agreement, § 1.1, "Grantors' Interest").)  Because Varga had already waived and relinquished any ability to pursue the Varga Claim, the "Grantors' Interest" only nominally included the Varga Claim.

83.     Varga declared under penalty of perjury that the Participation Agreement was, "in essence," a sale of the Offshore Estates' interest in the PBF Bankruptcy Cases.  (Ex. G at 9 (Supplemental Disclosure, ¶ 4).)

84.     The Supplemental Disclosure does not mention the Varga Claim.

85.     Under the terms of the Participation Agreement, Varga agreed that upon closing he would "refrain from acting in respect of any request, act, decision or vote concerning or relating to the Grantors' Interest . . . only in accordance with Participant's written direction . . . ." (Ex. G at 21 (Participation Agreement, § 9.1).)

86.     However, in a later letter addendum to the Participation Agreement requested by the PBF Trustee, dated January 14, 2014, the Participation Agreement was amended to provide:

> Participant agrees that . . . Geoffrey Varga, . . . in his capacity as the liquidating **Trust Monitor** of the Liquidating Trust (the "Monitor"), **will not be required to take any action that he believes alters, impacts and/or violates any duties that he might have as the Monitor . . . .**

(Ex. G at 36 (Participation Agreement, Letter Agreement dated Jan. 14, 2014), emphasis added.)

87.     Varga served a copy of the Joint Motion (with all its exhibits) on the Chapter 11 Trustee and his counsel.

88.     However, as Varga stated in the Supplemental Disclosure, the copy of the Participation Agreement he filed with the PBF Bankruptcy Court had "essential business terms . . . redacted," concealing the identity of the Participant, the percentage of the participation interest, and the purchase price (which was later revealed to be approximately $16 million).

89.     Stern never adequately disclosed to all the members of the UCC or the Chapter 11 Trustee or this Court that he, through Stonehill, purchased a 100% economic interest in the Varga Claim.

90.     Stern never caused Stonehill or Varga to file a notice under Bankruptcy Rule 3001 advising this Court, the US Trustee, or the Chapter 11 Trustee that Stonehill purchased a 100% economic interest in the Varga Claim.

91.     Stern never caused Stonehill or Greenpond to file a notice under Bankruptcy Rule 2019(b) advising this Court, the US Trustee, or the Chapter 11 Trustee that Stonehill, the purported holder of one of the largest unsecured proofs of claim in the PCI Bankruptcy Cases, was managed by the same investment manager as Greenpond—the holder of a $141 million claim.

## II.     THE NEGOTIATION AND CONFIRMATION OF THE PCI PLAN.

### A.     Stern Undertakes Development Of The Huron Model.

92.     Stern and Greenpond pursued the creation of a chapter 11 plan in order to receive a distribution and a return on Greenpond's acquisition of the Acorn Claim.

93.     In 2014, Stern provided to the Chapter 11 Trustee the framework for a plan, along with a "Plan Term Sheet" (a copy of which is attached as Exhibit H).

94.     The Plan Term Sheet included the largest claims asserted in the PCI Bankruptcy Cases but excluded the Varga Claim.

95.     As of 2015, when there was still no plan circulated to creditors, Stern enlisted the aid of other creditors to file the *Joint Objection by Petters Victims and Claimants to Certain Interim Fee Applications* [D.E. 2693] (the "Fee Objection"), in an effort to motivate the estates' professionals to advance a confirmable chapter 11 plan.  Stern did not request that Varga join the objection based on the supposed Varga Claim.

96.     The Fee Objection prompted the Court to order a mediation between what Stern dubbed the largest creditors of the PCI Bankruptcy Cases.

97.     The mediation was scheduled for September 2015 (the "September 2015 Mediation"). The participants included the Lancelot Trustee, the PBF Trustee, Greenpond (represented by Stern), Interlachen (represented by Breiland), counsel to the UCC, and the Chapter 11 Trustee and his counsel.

98.     Before the September 2015 Mediation, Stern recommended that the UCC re-engage Huron Consulting Group ("Huron"), the UCC's financial advisor, to create a "Petters Distribution Model" to facilitate the negotiation of a global settlement that would form the basis of a confirmable chapter 11 plan.

99.     The UCC directed Huron to consult with the PCI Trustee and the UCC members, including Stern, to identify the body of potential claimants that would receive distributions. Huron also identified all anticipated baskets of recovery and assigned estimated recovery values.

100.    The Huron Model, which was intended to be comprehensive, was designed to allow the participants to modify a particular data point and then automatically recalculate the precise expected dollar distribution.

101.    As Stern described it, the Huron Model was "an open source model" upon which all major creditors could rely to calculate their distributions in real dollars.

102.    After securing Huron's engagement, Stern became directly responsible for the genesis of the model Huron ultimately created (the "Huron Model," a copy of which is attached as Exhibit I).

103.    At the outset of Huron's engagement, Stern provided Huron a copy of the Plan Term Sheet and his own model (what Huron called the "Stern Model," a copy of which is attached as Exhibit J).

104.    As with the Plan Term Sheet, Stern assigned no value to the Varga Claim in the Stern Model's calculation and provided that the Varga Claim would receive no distribution.

105.    Stern weighed in frequently on each iteration of the Huron Model, knowing all major creditors would rely on its completeness and accuracy to negotiate the amounts of the major claims and the appropriate structure of a plan.

106.    The Huron Model included a tab that contained an analysis of all the claims on the docket in these Chapter 11 Cases, including the Varga Claim.  Consistent with Varga's prior representations dating back years to both the PCI Trustee and the PBF Trustee, the Varga Claim was listed specifically as being "duplicative of Mukamal claim" (i.e., the PBF II Claim).

107.    The Varga Claim was explicitly valued at $0 in the Huron Model and would receive no distribution.

108.    While developing the Huron Model, Stern never suggested to the UCC or the Plan Proponents that the Huron Model incorrectly valued the Varga Claim at $0.

**B.      Stern Enters Into Miami Accord With Lancelot And PBF Trustees Under Which Greenpond Receives Material Benefits.**

109.    On August 24, 2015, the PBF Trustee, the Lancelot Trustee, and a Greenpond representative met in person at the Miami offices of the PBF Trustee's counsel (the "Miami meeting").  In addition to the PBF Trustee and the Lancelot Trustee, also present at the Miami meeting were the Lancelot Trustee's forensic accountant, Timothy Martin, the PBF Trustee's counsel, Michael Budwick and Peter Russin, and Chaim Fortgang (on behalf of Greenpond). Stern joined the Miami meeting via telephone.

110.    The purpose of the Miami meeting was to arrive at an agreement between the three major constituencies based on the express understanding that the claims held by the PBF Trustee (totaling $651 million), the Lancelot Trustee (totaling $764 million) and Greenpond (totaling $142 million) together totaled $1.557 billion, or roughly 82%, of the anticipated $1.9 billion total claims body.

111.    During the Miami meeting, the parties reviewed the claims of each of the major cash-on-cash creditors: Lancelot, the PBF Funds, Greenpond, Interlachen, Ritchie Capital Management, LLC and affiliated creditors (collectively, "Ritchie Capital"), and Ark Discovery II, LP ("Ark Discovery").  The parties also considered the "Other Creditors"—the category of creditors under which the Varga Claim was valued at $0.

112.    Based upon their discussion of each claim, and the "Other Creditors," the parties to the Miami meeting agreed that the total claims pool was roughly $1.9 billion.

113.    The parties to the Miami meeting focused not merely on the dollar amount of their claims, but their relative percentage of the entire projected claims pool, since this percentage would ultimately dictate their actual distributions.  On this premise, the parties to the Miami meeting negotiated an accord that allowed Lancelot roughly 40% of the claims pool, the PBF Funds roughly 34%, and Greenpond 7.5% (the "Miami Accord").

114.    Notably, both the Lancelot and PBF Trustees agreed at the Miami meeting to support complete substantive consolidation of the PCI Estates without restrictions so as to allow Greenpond to participate in the $130 million in recoveries held by PGW.

115.    The Lancelot and PBF Trustees also agreed at the Miami meeting not to join in any objection that the Chapter 11 Trustee might assert regarding the assignment of the Acorn Claim made without the Chapter 11 Trustee's required consent.

116.    During the Miami meeting, neither Stern nor Fortgang challenged or expressed any disagreement with the $0 valuation of the Varga Claim, knowing the $0 valuation formed the foundation for the parties' calculation of the "Other Creditors."

**C.    Stern And Varga Attend September 2015 Mediation Which Results In Global Settlement Of Major Claims Based, In Part, Upon $0 Valuation Of Varga Claim.**

117.    The September 2015 Mediation took place on September 2-3, 2015.  The PCI Trustee, the Lancelot Trustee, the PBF Trustee, Greenpond (represented by Stern and Fortgang), Interlachen, and the UCC (and all their respective counsel) participated.

118.    At the request of the Plan Proponents, Huron also attended the September 2015 Mediation, to assist the participants with running various proposed scenarios through the Huron Model.  Its presence helped ensure the participants were operating from the same, accurate assumptions to facilitate good faith negotiations.

119.    Varga also attended the September 2015 Mediation with an entourage of financial and legal advisers in his capacity as a fiduciary to the Lancelot Estates.  He was provided with a copy of the Huron Model, which valued the Varga Claim at $0.

120.    The PBF Trustee specifically discussed the Huron Model with Varga during the September 2015 Mediation.

121.    Neither Varga nor his professionals communicated that the Varga Claim was incorrectly valued for the settlement negotiations that took place during the two-day September 2015 Mediation.

122.    Varga expressed his support and agreement with the final waterfall, which reflected substantial anticipated distributions to PBF II and that the Varga Claim would receive absolutely nothing from the PCI Estates.

123.     A settlement of what were understood to be the largest claims in the PCI
Bankruptcy Cases was achieved.  These settlements formed the backbone of the PCI Plan, which
Greenpond volunteered to prepare with the Lancelot Trustee.  The PCI Trustee prepared the
disclosure statement.

124.     Among other things, the settlement terms provided for the substantive
consolidation of the PCI and PGW estates and the agreement of the Chapter 11 Trustee not to
object to Greenpond's acquisition of the Acorn Claim.

125.     Despite Greenpond's failure to seek the Chapter 11 Trustee's consent, and its
acquisition of a claim filed against only PCI, the Miami Accord and the settlements allowed
Greenpond a distribution of at least $9 million more than it would have had the PCI and PGW
estates not been substantively consolidated.

### D.    Stern Negotiates And Drafts PCI Plan And Approves Of PCI Disclosure Statement, Which Are Both Premised Upon $0 Valuation Of Varga Claim.

126.     On February 22, 2016, the PCI Trustee filed the *Amended Disclosure Statement in
Support of Chapter 11 Plan of Liquidation* [D.E. 3131] (the "PCI Disclosure Statement") and the
Plan Proponents filed the PCI Plan.

127.     The PCI Disclosure Statement described that the PCI Plan was premised, in part,
upon the settlements derived from the September 2015 Mediation.  (*See* PCI Disclosure
Statement at 5.)

128.     The PCI Disclosure Statement estimated a Class 3 General Unsecured Claims
pool of $1.9 billion with a projected recovery of 10-14% of the assigned claim value on allowed
claims—figures derived directly from the Huron Model.  (*Id.* at 11.)

129.     The Class 3 General Unsecured Claims pool, together with the estimated
recovery, was based upon a $0 valuation of the Varga Claim.

130.    Also as described in the PCI Disclosure Statement, Greenpond assigned an interest in a portion of its Acorn Claim to Interlachen in return for Interlachen's agreement not object to the PCI Plan.[4]

131.    Stern and his counsel participated extensively in the negotiation, preparation, finalization and approval of the PCI Plan during several meetings, phone calls, and innumerable drafts.

132.    Stern reviewed the draft of the PCI Disclosure Statement and provided comments and edits, knowing that the PCI Disclosure Statement would be presented to the Court for approval and then relied upon by all creditors when deciding whether to support or reject the PCI Plan.

133.    Stern never advised the PCI Trustee or the other Plan Proponents that the estimates and projections regarding the Class 3 General Unsecured Claims pool ($1.9 billion in claims and an anticipated 10-14% distribution) were wrong because they omitted the Varga Claim.

134.    Before confirmation, Stern solicited other major creditors, like Ritchie Capital, to convince them to support the PCI Plan, reinforcing and affirmatively representing to them that the projections in the PCI Disclosure Statement were accurate.

135.    The PCI Plan Stern helped to draft was premised upon victims receiving a single recovery with indirect victims (like Varga) obtaining recourse exclusively from the party with which they had direct privity.  The PCI Plan specifically provided that,

> duplicative Claims filed against the Debtors, including . . . claims
> sounding in tort that purport to recover the same, or substantially

---

[4] This lawsuit does not seek to equitably subordinate, disallow or otherwise impact that Acorn interest assigned to Interlachen.

the same, damages as other Claims, and Claims that purport to establish joint and several liability, shall be expunged and disallowed upon the Effective Date, and the Holder of any Claims shall receive a single recovery on account of any such joint or duplicative obligations.

(PCI Plan at Art. 6.1.)

136.    While many of the major creditors in turn had their own substantial creditor or investor body, the premise of the Miami Accord, the Stern Model, the Huron Model and the settlements underlying the PCI Plan and the PCI Disclosure Statement was that only claims of direct lenders would be allowed.

137.    The PCI Plan allowed PBF Claims of $85,987,311.00 for Palm Beach Finance Partners Liquidating Trust and $565,755,364.00 for Palm Beach Finance II Liquidating Trust. (*See id.* at Art. 5.2.)

138.    The PCI Plan also expressly provided for the PCI Trustee's consent to Greenpond's acquisition of the Acorn Claim—a negotiated term dating back to the Miami meeting.  (*See id.* at Art. 12.17.)

139.    Because the Varga Claim sought to "recover the same, or substantially the same, damages" as the PBF II Claim and was identified as "duplicative of Mukamal claim" in the Huron Model that underpinned the PCI Plan, among other reasons, the Plan Proponents understood that the Varga Claim would be expunged (if it was not voluntarily withdrawn).

**E.**    **The PBF Trustee Advises The PBF Bankruptcy Court And Offshore Funds Of The Treatment Of Their Claims Under The PCI Plan.**

140.    Both the Lancelot and PBF Trustees required approval from their own bankruptcy courts to serve as Plan Proponents.  The PBF Trustee sought approval from the PBF Bankruptcy Court on January 19, 2016 by filing a *Motion for Authority with Respect to the Chapter 11 Plan*

*of Liquidation for Petters Company, Inc. et al.* [D.E. 2810 in PBF Bankruptcy Cases] (the "<u>PBF Plan Proponent Motion</u>," a copy of which (without attachments) is attached as <u>Exhibit K</u>).

141.    The PBF Plan Proponent Motion was served on all parties in interest to the PBF Bankruptcy Cases and, as a co-fiduciary of the PBF Estates, Varga reviewed the PBF Plan Proponent Motion.

142.    Varga charged fees to the PBF Estates to review (and have his counsel review) the PBF Plan Proponent Motion.

143.    The PBF Plan Proponent Motion outlined the treatment of the PBF Claims in detail, and reasoned that because the PBF Claims would be "allowed in full on a cash-on-cash basis" and that "the claims of other creditors . . . will also be recognized on a cash-on-cash basis," the PBF Trustee—on behalf of all the creditors of the Palm Beach Estates—agreed to serve as a Plan Proponent and accept the PCI Plan.  (*See* Ex. K at 16-17 (PBF Plan Proponent Motion ¶ 33).)

144.    The PBF Bankruptcy Court conducted an evidentiary hearing on the PBF Plan Proponent Motion on February 24, 2016.  Excerpts of the transcript of this hearing are attached as <u>Exhibit L</u> ("<u>Plan Proponent Motion Hr'g Tr.</u>").  At the evidentiary hearing, the PBF Trustee's counsel confirmed that no objections to the PBF Plan Proponent Motion had been lodged, and that the "main deal points" included that "there will be 100 percent allowance for the cash on cash fraud claims and losses sustained by the two Palm Beach debtors . . . ."  (Ex. L (Plan Proponent Motion Hr'g Tr.) at 7:7-8, 18-21.)

145.    The PBF Trustee's counsel provided these salient points as a proffer of testimony for the PBF Trustee, not just to the PBF Bankruptcy Court, but to all parties in interest:

    a.     It was estimated that "the anticipated unsecured creditor body [for the PCI Bankruptcy Cases] is expected to be just about 2 billion dollars."  (*Id.* at 8:3-5.)

    b.     "That would put the two [PBF Claims] almost exactly at one third of the entire creditor class in the [PCI Bankruptcy Case]."  (*Id.* at 8:7-9.)

    c.     The PCI Disclosure Statement "anticipates that there will be a distribution between 10 and 14 percent."  (*Id.* at 8:10-11.)

146.    Neither Varga nor Stern (on behalf of Stonehill) objected to the PBF Plan Proponent Motion.

147.    The PBF Trustee's proffer of the testimony was accepted and received into evidence, along with related supporting documents submitted with an exhibit register.  The PBF Bankruptcy Court granted the motion on March 4, 2016 [D.E. 2862 in PBF Bankruptcy Cases] (Order Granting PBF Plan Proponent Motion, a copy of which is attached as <u>Exhibit M</u>).

148.    Notwithstanding his fiduciary obligations to the PBF Estates and the diluting effect pursuing the Varga Claim would have on the PBF Trustee's recovery from the PCI Estates, Varga never advised the PBF Bankruptcy Court, the US Trustee, the PBF Trustee or creditors of the PBF Bankruptcy Cases that the above factual predicates were materially wrong because of his (or Stonehill's) intent to pursue the Varga Claim.  Instead, Varga remained silent.

149.    Similarly, when the Lancelot Trustee sought court approval to be a Plan Proponent, Varga, in his separate fiduciary duty to the Lancelot Estates, disclosed nothing about his (or Stonehill's) intent to pursue the Varga Claim.

**F.**    **Greenpond's Affirmative Misrepresentations To Plan Proponents.**

150.    Shortly after the PCI Plan and PCI Disclosure Statement were filed, counsel for the Chapter 11 Trustee was tasked with reviewing the claims register for claimholders that might vote against the PCI Plan, necessitating objections.

151.    On March 2, 2016, the Chapter 11 Trustee's counsel, Adam Ballinger, requested that either Stern or the PBF Trustee speak with Varga about withdrawing the Varga Claim prior to confirmation, to obviate the need for filing an objection.

152.    Stern volunteered to speak with Varga about withdrawing the Varga Claim, without disclosing that *he*—and not Varga—made the decisions on the Varga Claim.

153.    Stern lied to Ballinger (and those copied on the email): instead of speaking with Varga about withdrawing the Varga Claim, Stern instead instructed Varga to do the opposite.

154.    Stern *drafted* the emails he wanted Varga to send back to Ballinger instead of simply replying to Ballinger himself.

155.    Varga attempted to "tinker with" Stern's language "so it feels like [his] words" in order to deceive Ballinger.

156.    Stern continued to ghostwrite Varga's emails to Ballinger, even placing brackets in the email for Varga to fill in with an excuse for his inability to immediately comply with the request.

157.    Varga sent the parroted responses Stern instructed him to remit.

158.    To lull the PCI Trustee's counsel into believing that nothing was amiss so as to avoid any potential impediment to the confirmation of the PCI Plan for which Greenpond was a Plan Proponent, at Stern's covert instruction, Varga communicated to the PCI Trustee's counsel

he was "supportive of the plan as filed" and did "not want to hold up confirmation of the plan or distributions to creditors on the effective date."  Varga also offered to "vote in favor of the plan" in an effort to deceive Ballinger into believing nothing was amiss.

159.    In breach of his fiduciary duties to both the PBF Estates and the Lancelot Estates, Varga failed to advise either the PBF Trustee or the Lancelot Trustee of his communications with Stern or that there was even a possibility he would not voluntarily withdraw the Varga Claim after confirmation of the PCI Plan (under which the PBF II Claim—and thus Stonehill's derivative claim—would be allowed).

160.    The PCI Trustee filed an objection to the Varga Claim on March 11, 2016; however, the PCI Trustee agreed to continue any hearing on the objection based upon Varga's deceitful representation that he was "supportive of the plan" that provided for no distribution on the Varga Claim.

161.    The Court confirmed the PCI Plan on April 15, 2016.  The PCI Plan went effective on April 22, 2016.

162.    Stern and Varga deliberately concealed from the Chapter 11 Trustee, his counsel, and the other Plan Proponents that Stern was giving, and Varga was accepting, instructions on refusing to withdraw the Varga Claim—down to the very verbiage of Varga's emails to Ballinger—even though both Varga and Stern agreed the Varga Claim would receive no distribution in their various communications with the other Plan Proponents.

**G.      Stern Misleads The Court Under Oath At Substantial Contribution Hearing.**

163.    Because of Greenpond's intimate role in the PCI Plan process, Greenpond filed with this Court an application pursuant to §§ 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code for hundreds of thousands of dollars in fees and expenses (the "Substantial Contribution Application").

164.    The Court set an evidentiary hearing on Greenpond's Substantial Contribution Application for September 19, 2016 to hear, among other things, the objection by the US Trustee.  At the hearing, Stern testified at length regarding Greenpond's contributions to the PCI Plan process.  Excerpts of the transcript of this hearing are attached as Exhibit N ("Substantial Contribution Application Hr'g Tr.").

165.    To put those efforts in context, Stern was asked to explain his interests in the PCI Bankruptcy Cases.

166.    During cross examination by the US Trustee, Stern concealed his pursuit of the Varga Claim, knowing it would not fit his narrative that Greenpond deserved reimbursement of an extraordinary amount of attorneys' fees.

167.    Stern testified,

a.      "[S]omething like, maybe, in the ninety-plus percent of the creditor body is—is represented by six groups, three of whom were official members of the committee, one of whom was [Greenpond], and then there were two others."  (Ex. N (Substantial Contribution Application Hr'g Tr.) at 12:18-22.)  Upon information and belief, the "two others" were Ark Discovery and Ritchie Capital, each of which held cash-on-cash losses of over $100 million.

      b.      "Stonehill . . . purchased indirect claims against this Palm Beach Liquidating Trust…. We had claims against the Palm Beach off-shore funds. The Palm Beach off-shore funds had claims against one of the Palm Beach on-shore funds. And the Palm Beach on-shore fund had claims against PCI." (*Id.* at 31:17-25.)

      c.      "[Stonehill] had … a derivative economic interest in a claim against Palm Beach, which then had an interest in a claim against PCI." (*Id.* at 32:8-10.)

      d.      "[Greenpond is] one creditor in a case with six major creditors." (*Id.* at 42:15-16.)

168.    Counsel for the US Trustee asked Stern about the Varga Claim.

169.    Rather than being honest with this Court regarding Stonehill's interest in the Varga Claim, Stern played coy, feigning ignorance and affirmatively concealing from this Court Stonehill's interests in and true intentions regarding the Varga Claim:

Q: … the Varga claim is claim number 103 in the case, correct?

A: Don't know.

Q: Okay. You don't have any reason to disagree with that, do you? The Palm Beach—the Varga claim for Palm Beach Finance is 720 million dollars, sound right?

A: Varga claim into Palm Beach Finance II is 718 million dollars.

…

Q: As a result of Stonehill's interest in the Varga claim and some of those other claims, you asserted to Mr. Kelley, the trustee, that you had the right to be heard on those issues, correct?

A: We have—so again, I want to be careful with the who's "we." Stonehill manages two investment vehicles. They have different investors, different clients. One of those investment vehicles owns Greenpond. That entity has no interest whatsoever in Palm Beach. The other entity has no interest whatsoever in Greenpond or Acorn. It does have a substantial interest in the results of Palm

Beach's recoveries where—pardon me, wherever they come from, certainly including from PCI.

…

Q:  And so are there any other major creditors in this case where you are—Stonehill or Greenpond have an indirect claim?

A:  No.

Q:  So it's just through the Varga claim and Palm Beach?

A:  *I don't know what the Varga claim—I'm not really sure what you're talking about by the "the Varga claim."*

*So again, we have two funds.  One of them has an interest in Greenpond, and that interest is in the Acorn claim.  We have another fund that has an interest in the Palm Beach estate, and that has, you know, benefits from whatever distributions come to the Palm Beach liquidating trust.*

(*Id.* at 33:21–34:3; 34:7-19; 35:11-15, emphasis added.)

170.    Stern never disclosed to the Court that he intended to pursue the $720 million Varga Claim ("claim number 103 in the case") during this line of questioning or at any point during the hearing.

## IV.    POST-CONFIRMATION PURSUIT OF THE OFFSHORE CLAIM.

171.    After confirmation of the PCI Plan, in May 2016, the PCI Trustee and the other Plan Proponents were advised that Stern represented not just the Acorn Claim, but also the Varga Claim.

172.    Also, after confirmation of the PCI Plan, Stern advised the Plan Proponents (all of whom were members of the Trust Committee) he intended to prosecute the Varga Claim, even though Varga had originally filed the claim "out of an abundance of caution" and the Varga Claim was classified by the Plan Proponents (including Greenpond) as "a duplicate of Mukamal claim."

173.    As an active member of the UCC, Stern knew that no chapter 11 plan would have been confirmed with the possibility of a $720 million claim being allowed.

174.    Stern instructed Varga to "play possum" to deceive the PBF Bankruptcy Court, the Lancelot Bankruptcy Court, this Court and every creditor and victim voting on the PCI Plan, hoping to spring the $720 million claim on the estates post-confirmation to achieve a shake down and extort the PCI Trust to pay him something to avoid the proverbial "expense and risk" of litigation.  Varga followed Stern's instructions in violation of his fiduciary duties to the PBF Estates and the Lancelot Estates.

175.    On December 17, 2016 (days before the deadline to file objections to claims), the PCI Trustee filed an Amended Objection to the Varga Claim [D.E. 3680].

176.    Recognizing that Varga was prohibited from taking any action that could harm the PBF Estates, Stonehill worked with Varga to protect Varga by eliminating his control over the Varga Claim.

177.    On April 17, 2017, at Stonehill's instruction, Varga purported to assign his interests in the Varga Claim to Offshore, the current claimholder.  Varga did so in breach of his fiduciary duties to the PBF Estates and the Lancelot Estates.

178.    On June 27, 2017, after being instructed by Stern, Varga filed a notice of Transfer of Claims Other Than for Security [D.E. 3807] under Bankruptcy Rule 3001, advising this Court that the Varga Claim was assigned to Offshore.

179.    Under the PCI Plan, the PCI Trustee "shall have no obligation to recognize any transfer of any Claim . . . occurring after the Effective Date and not permitted under the PCI Liquidating Trust Agreement . . . ."  (PCI Plan at Art. 9.8.)

180.    Under the PCI Liquidating Trust Agreement, which is Exhibit B to the PCI Plan (the "Trust Agreement"), a transfer is a "Permitted Transfer" if the transfer is to an "Affiliate" of a holder of a trust interest.  (Trust Agreement at Art. 2.4(d).)

181.    In order to effectuate the transfer of the Varga Claim to Offshore, Varga was required to provide the PCI Trustee with written notice of, among other things, documentation evidencing such transfer was a Permitted Transfer.  (*Id.* at Art. 2.4(a).)  Varga did not comply with the requirements of Article 2.4(a) of the Trust Agreement.  Therefore, the purported transfer of the Varga Claim to Offshore is invalid.

182.    On May 4, 2018, the other members of the Trust Committee demanded Greenpond's resignation from the Trust Committee and repeated its request that Stern withdraw the Varga Claim.

## V.    DEFENDANTS' MISREPRESENTATIONS & OMISSIONS

183.    Defendants made several misrepresentations and omissions of material fact when, because of their fiduciary positions, they had a duty to speak and to disclose.  Defendants misrepresented to and concealed from the PCI Trustee, the PBF Trustee, fellow members of the UCC, the US Trustee, this Court, and the victims of the Debtors that Stern/Stonehill controlled the $720 million Varga Claim and intended to pursue it in full.

184.    The following describes some of Defendants' key representations, misrepresentations, and omissions and the context in which they arose.  These allegations are common to each count contained herein (collectively, the "Misrepresentations and Omissions"):

a.    On June 8, 2010, Varga and his counsel, Mr. Estrada, and the PBF Trustee and his counsel, Mr. Budwick, met with the Chapter 11 Trustee and his counsel, Messrs. Uphoff and Lodoen at the Chapter 11 Trustee's office in Minneapolis, Minnesota.

During that meeting, Varga communicated to Mr. Lodoen that the Varga Claim was, as stated on its face, filed out of an abundance of caution and that it would be withdrawn or voluntarily dismissed once the PBF II Claim in the PCI Bankruptcy Cases was allowed.

b.      In September 2010, as set forth in the PBF Plan for which Varga was a co-proponent, Varga agreed with the PBF Trustee that Varga would not pursue any joint tort claims against any third parties.  Claims against PCI constituted such a joint tort claim. Rather, Varga agreed to recover exclusively from the PBF II Estate.

c.      Thereafter, Varga and his counsel communicated to the PBF Trustee and his counsel that the Varga Claim was intended only as a backup to the PBF II Claim and would be voluntarily withdrawn if the PBF II Claim were allowed.  Varga and his counsel authorized the PBF Trustee to communicate this fact to the PCI Trustee.

d.      On December 27, 2010, Varga executed and filed in the PBF Bankruptcy Cases an affidavit of disinterestedness in support of an application to employ Kinetic Partners (Cayman) Ltd., his employer, in his capacity as Trust Monitor [D.E. 505 in PBF Bankruptcy Cases] ("Varga Disinterestedness Affidavit," a copy of which is attached as Exhibit O). Varga stated under penalty of perjury:

> . . . neither I nor Kinetic hold or represent any interest adverse to the Debtors, the Debtors' estates, creditors, the Liquidating Trusts and their Beneficiaries or other interested parties and we are disinterested persons within the meaning of section 101(14) of the Bankruptcy Code . . . .

(Ex. O at 12 (Varga Disinterestedness Affidavit, ¶ 5).)

e.      In January 2014, after consummating the Participation Agreement, Stonehill filed no notice under Bankruptcy Rule 3001—which requires that a transferee of a claim file evidence of the claim transfer—even though Stonehill claims that everything but title interest of the Varga Claim was transferred to Stonehill in 2013.

Then, neither Stern, Stonehill nor Greenpond disclosed to the Chapter 11 Trustee, the Lancelot Trustee, or Interlachen that Stonehill was the owner of the Varga Claim, despite Greenpond's fiduciary obligations as a member of the UCC.

f.    On <u>January 14, 2014</u>, in the Supplemental Disclosure, Varga represented that,

> In essence, the Agreement provides that, in exchange for the consideration received by the Offshore Funds, the Participant will receive certain distributions to be made from the PBF II Liquidating Trust and will be actively involved in the PBF II bankruptcy case, subject to the restrictions contained in the Agreement to ensure that the Monitor maintains an independent role in the PBF II bankruptcy case.

(Ex. G at 9 (Supplemental Disclosure, ¶ 4).)  Varga excluded any reference to the Varga Claim.  The Joint Motion and Supplemental Disclosure reiterated the accuracy of the Varga Disinterestedness Affidavit, made no supplemental disclosure regarding the Varga Claim, and requested approval of the continued roles of Varga's professionals because they "do not hold or represent interests adverse to the [PBF] estates and continued to be disinterested . . . ."  (Ex. G at 6 (Joint Motion, ¶ 13).)

g.    On <u>June 28, 2014</u>, Stern, on behalf of Greenpond, provided to the Chapter 11 Trustee the Plan Term Sheet.  In the Plan Term Sheet, Stern included those creditors he identified as the major creditors to the PCI Estates.  Stern's Plan Term Sheet did not mention the Varga Claim, which reflected that the Varga Claim would receive no distribution provided the PBF II Claim (which *was* included in the Plan Term Sheet) were allowed.

h.    From <u>June 2015 through September 2015</u>, Stern, on behalf of Greenpond, worked extensively with Huron to develop the Huron Model.  The Huron Model explicitly identified the Varga Claim as "duplicative" and worth $0.  Stern failed to

advise the Chapter 11 Trustee and UCC members that he believed this to be false, despite Stern's and Greenpond's fiduciary obligations as a member of the UCC and his knowledge that creditors would be relying upon the Huron Model's projections. Stern knew all participants to the September 2015 Mediation would rely on the veracity of the representation that the Varga Claim would receive nothing.

i.      On <u>August 24, 2015</u>, Stern, on behalf of Greenpond, joined via telephone a meeting with the Lancelot Trustee, his forensic accountant, Mr. Martin, the PBF Trustee, his counsel, Messrs. Budwick and Russin, and Mr. Fortgang for the Miami meeting at the offices of Meland Russin & Budwick, P.A. (counsel to the PBF Trustee). The purpose of the Miami meeting was to arrive at an agreement between the three major constituencies before the September 2015 Mediation based on the express understanding that the claims held by the PBF Trustee (totaling $651 million), the Lancelot Trustee (totaling $764 million) and Greenpond (totaling $142 million) together totaled $1.557 billion or roughly 82% of the anticipated $1.9 billion total claims body.  At the Miami meeting, the parties negotiated the Miami Accord, which allowed Lancelot roughly 40% of the claims pool, the PBF Funds roughly 34%, and Greenpond 7.5%.  Both the Lancelot and PBF Trustees agreed to support complete substantive consolidation of the PCI Estates without restrictions to allow Greenpond to participate in the $130 million in recoveries held by PGW.  Greenpond agreed the claims pool would be $1.9 billion, of which Greenpond would constitute 7.5%.  Greenpond agreed that the Varga Claim would receive no distribution.

j.      On <u>September 2-3, 2015</u>, Stern, on behalf of Greenpond and Stonehill, participated in the September 2015 Mediation in Minneapolis, Minnesota, at the offices

of Lindquist & Vennum LLP (counsel for the Chapter 11 Trustee). During the mediation,

Stern consulted extensively with Huron on the Huron Model, which explicitly described

the Varga Claim as "duplicative" and valued the claim at $0. Stern failed to advise the

mediator, the Chapter 11 Trustee, the UCC members, and the other participants to the

September 2015 Mediation that he believed this to be false, despite Greenpond's

fiduciary obligations as a member of the UCC and his express understanding that

creditors would rely upon the accuracy of the Huron Model's projections.

k.      On December 26, 2015, Greenpond circulated a redline of its proposed

changes to the PCI Disclosure Statement to the other Plan Proponents. Greenpond's

changes included no amendments to the PCI Disclosure Statement's $1.9 billion claims

pool and the attendant projection of recoveries for unsecured creditors, despite

Greenpond's fiduciary obligations as a member of the UCC and Stern's knowledge that

creditors would rely upon the accuracy of the PCI Disclosure Statement to vote on the

PCI Plan and the Court would similarly rely upon its accuracy in considering it for

approval.

l.      In early 2016, the PCI Trustee and UCC negotiated with a significant

creditor, Frances Gecker in her capacity as chapter 7 trustee for Ark Discovery (the "Ark

Trustee") regarding her claim against the PCI Estates. Stern was intimately involved in

all facets of these negotiations and volunteered to negotiate directly with the Ark Trustee.

The parties agreed that rather than have the Ark Trustee's claim be allowed in a specific

dollar amount, the PCI Plan would provide for a one-time $8.4 distribution payment to

her. This one-time payment was premised on a $1.9 billion claims pool and a projected

10-14% distribution, per the PCI Disclosure Statement. At no time did Stern disclose to

the PCI Trustee or the Committee that he believed these assumptions to be wrong and that the PCI Estates were potentially overpaying the Ark Trustee by more than $2 million.

m.   On January 19, 2016, the PBF Trustee filed the PBF Plan Proponent Motion in the PBF Bankruptcy Cases.  On February 24, 2016, the PBF Bankruptcy Court held an evidentiary hearing on the PBF Plan Proponent Motion.  Neither Stonehill nor Varga (who charged the PBF Estates to review the Motion) objected to the PBF Plan Proponent Motion, even though it was explicitly premised upon a $1.9 billion claim pool that did not include the Varga Claim.

n.   On February 22, 2016, Greenpond and the other Plan Proponents filed the First Amended Chapter 11 Plan of Liquidation, which was based upon a $1.9 billion claims pool, as set forth in the PCI Disclosure Statement filed that same day.  Stern, as Greenpond's managing agent, signed the First Amended Chapter 11 Plan of Liquidation and asked creditors of these Chapter 11 Cases to vote for it.  The PCI Plan specifically provided that victims would receive a single recovery and that indirect victims (like Varga) could seek recourse exclusively from the party with which they had direct privity. Because the Varga Claim sought to "recover the same, or substantially the same, damages" as the PBF II Claim and was identified as "duplicative of Mukamal claim" in the Huron Model that underpinned the PCI Plan, the Plan Proponents understood that the Varga Claim would be expunged (if it was not voluntarily withdrawn).  Stern never corrected this understanding by the other Plan Proponents and never advised the Chapter 11 Trustee, the UCC, the Plan Proponents, this Court, or the creditors of these estates that the $1.9 billion claims pool upon which the PCI Plan was premised was false, despite

Stern's and Greenpond's fiduciary obligations as a member of the UCC and a Plan Proponent and Stern's knowledge that creditors would rely upon the accuracy of the PCI Disclosure Statement to vote on the PCI Plan.

o.    Starting in late 2015, Stern solicited support for the PCI Plan from Ritchie Capital and other major creditors by affirmatively representing to them that their recoveries would be based upon a $1.9 billion claims pool, which was premised on the Varga Claim receiving nothing.

p.    On March 2, 2016, Stern, as a representative of Greenpond, represented to the PCI Trustee's counsel, the PBF Trustee, and the PBF Trustee's counsel he would speak with Varga about withdrawing the Varga Claim.  However, instead of speaking with Varga about withdrawing the Varga Claim as he agreed to do, Stern covertly instructed Varga to do the opposite.  Stern deliberately concealed from Ballinger, the PBF Trustee, and the members of the UCC these secret communications and the fact that he (and not Varga) was the decision maker regarding the Varga Claim.

q.    After the March 2, 2016 email and through confirmation of the PCI Plan, Stern, acting on behalf of both Greenpond and Stonehill, aided by Varga, willfully concealed from the Chapter 11 Trustee, the UCC and the Plan Proponents his intention to prosecute the $720 million Varga Claim.

r.    On April 8, 2016, Greenpond and the other Plan Proponents filed the PCI Plan (i.e., the Second Amended Chapter 11 Plan of Liquidation).  The PCI Plan was based upon a $1.9 billion claims pool, as set forth in the PCI Disclosure Statement filed that same day.  Greenpond signed the PCI Plan and asked creditors of these Chapter 11 Cases to vote for the PCI Plan.  Stern concealed from the Chapter 11 Trustee, the UCC,

the Plan Proponents, the US Trustee, this Court, and the many victims of Petters' fraud that the $1.9 billion claims pool upon which the PCI Plan was premised was wrong, despite Stern's and Greenpond's fiduciary obligations as a member of the UCC and Plan Proponent and Stern's knowledge that creditors would rely upon the accuracy of the representations in the PCI Disclosure Statement to decide whether to vote to accept or reject the PCI Plan.

s.      On <u>September 19, 2016</u>, at the evidentiary hearing before this Court on Greenpond's Substantial Contribution Application, Stern, on behalf of Greenpond, testified, under oath regarding the interests of both Stonehill and Greenpond in the PCI Bankruptcy Cases.  At the Substantial Contribution Hearing, counsel for the US Trustee explicitly asked Stern about Claim No. 103, which he defined as the "Varga Claim." Stern testified that Stonehill Management has "two funds.  One of them has an interest in Greenpond, and that interests is in the Acorn claim.  [Stonehill Management has] another fund that has an interest in the Palm Beach estate, and that has, you know, benefits from whatever distributions come to the Palm Beach liquidating trust."  Stern deceptively concealed from counsel for the US Trustee and this Court that Stonehill owned, controlled, and intended to prosecute Claim No. 103 (*i.e.*, the Varga Claim) directly against the PCI Estates.

## FIRST CLAIM FOR RELIEF
## <u>(EQUITABLE SUBORDINATION AGAINST GREENPOND AND OFFSHORE)</u>

185.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 184 as if fully set forth herein.

186.    Defendants made the Misrepresentations and Omissions to induce the Chapter 11 Trustee, the other Plan Proponents, the US Trustee's office, this Court, two other United States

Bankruptcy Courts (in Palm Beach and Chicago), and the victims of Petters' fraud into supporting confirmation of the PCI Plan, which, based upon what Plaintiff knows now, was premised upon patently false information.

187.   Only Greenpond, Stonehill—both represented and controlled by Stern—and Varga knew Stern's intent to prosecute the Varga Claim after confirmation of the PCI Plan.

188.   Stern and Varga willfully concealed that information to deceive and induce everyone's reliance upon the predicates underlying the PCI Plan—a general unsecured claim pool of approximately $1.9 billion with projected recoveries of approximately 10-14% and, more specifically, that the major creditors would receive an agreed upon percentage of that Claims pool.

189.   But for the Misrepresentations and Omissions, the Plan Proponents would not have permitted Stern to continue representing Greenpond on the UCC and would not have appointed Stern to the Trust Committee.

190.   As a member of the UCC and the Trust Committee, Stern had access to confidential and privileged information and communications—all of which Stern could have (and likely) used to the advantage of Greenpond and Stonehill in negotiating the PCI Plan.

191.   But for the Misrepresentations and Omissions, the Chapter 11 Trustee (with the support of the Lancelot and PBF Trustees) would not have consented to the assignment of the Acorn Claim to Greenpond.

192.   But for the Misrepresentations and Omissions, the Chapter 11 Trustee, the Lancelot Trustee and the PBF Trustee would not have agreed to the substantive consolidation of the PCI and PGW estates, which allowed Greenpond to receive a distribution from the combined assets of those estates.

193.    But for the Misrepresentations and Omissions, the Chapter 11 Trustee, the other Plan Proponents, the US Trustee, and the creditors who voted for the PCI Plan would not have supported the PCI Plan, since it was based upon false information.

194.    But for the Misrepresentations and Omissions, this Court would not have approved of the PCI Disclosure Statement or confirmed the PCI Plan.

195.    Stern, on behalf of Greenpond, participated on the UCC and held himself out to be a fiduciary and a person of trust to his fellow UCC members.

196.    Stern, on behalf of Greenpond, signed the PCI Plan, approved the PCI Disclosure Statement in support of the PCI Plan, and otherwise held himself out to be a fiduciary and a person of trust to all the creditors of these Chapter 11 Cases as a Plan Proponent.

197.    Stern exploited his position of trust, made numerous false representations after fostering that trust, and willfully concealed material information to those to whom he owed a fiduciary duty to be candid and transparent.

198.    Because of this willful misconduct, Greenpond gained an unfair advantage in the plan negotiation process that ultimately resulted in the allowance of the Acorn Claim against substantively consolidated estates.

199.    Stonehill has also unfairly benefited from the above described willful misconduct by continuing to prosecute the Varga Claim and attempting to extort a payout on the Varga Claim with the threat of expensive, protracted litigation and a delay in distributions to legitimate victims of the Petters Ponzi scheme, even though the PBF II Claim (the claim to which Varga agreed to limit his recovery) was allowed in full.

200.    The creditors of the PCI Estates have been damaged because of the Misrepresentations and Omissions and Defendants' willful misconduct.  These damages include,

but are not limited to, the $40,000,000 held in reserve because of the Varga Claim that would otherwise be available for immediate distribution to holders of allowed claims. The PCI Estates also entered into costly settlement agreements, like the settlement with Ark Discovery, based upon Defendants' Misrepresentations and Omissions. Creditors of the PCI Estates have also had to bear the burden of substantial litigation expenses associated with defending against the Varga Claim and pursuing this lawsuit.

201.    Greenpond has already received $7,836,886 in distributions from the combined assets of PCI and PGW—a distribution it received as a direct result of misrepresentations and willful misconduct.

202.    Because of Greenpond's and Stonehill's misrepresentations and willful misconduct, Stern and Stonehill are now prosecuting a $720 million claim previously valued by all parties at $0. Should the Varga Claim be allowed, Stonehill may receive up to $100 million in distributions on a claim that Greenpond and Stonehill originally agreed to being treated as worthless.

WHEREFORE, Plaintiff prays as follows:

A.    That the Unassigned Acorn Claim and the Varga Claim be equitably subordinated to all other claims in these Chapter 11 Cases or disallowed in their entirety pursuant to 11 U.S.C. § 510(c);

B.    That Greenpond be required to disgorge all distributions it has received from the PCI Estates; and

C.    The Court award any and all such further relief as this Court deems equitable.

**SECOND CLAIM FOR RELIEF**
**(DISALLOWANCE UNDER 11 U.S.C. § 502(J) AGAINST GREENPOND)**

203.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 202 as if fully set forth herein.

204.    Defendants made the Misrepresentations and Omissions to induce the Chapter 11 Trustee, the other Plan Proponents, the US Trustee's office, this Court, two other United States Bankruptcy Courts (in Palm Beach and Chicago), and the victims of Petters' fraud into supporting confirmation of the PCI Plan, which, based upon what Plaintiff knows now, was premised upon patently false information.

205.    Only Greenpond, Stonehill—both represented and controlled by Stern—and Varga knew Stern's intent to prosecute the Varga Claim after confirmation of the PCI Plan. Stern and Varga willfully concealed that information to deceive and induce everyone's reliance upon the predicates underlying the PCI Plan—a general unsecured claim pool of approximately $1.9 billion with projected recoveries of approximately 10-14% and, more specifically, that the major creditors would receive an agreed upon percentage of that Claims pool.

206.    But for the Misrepresentations and Omissions, the Plan Proponents would not have permitted Stern to continue representing Greenpond on the UCC and would not have appointed Stern to the Trust Committee.

207.    As a member of the UCC and the Trust Committee, Stern had access to confidential and privileged information and communications—all of which Stern could have (and likely) used to the advantage of Greenpond and Stonehill in negotiating the PCI Plan.

208.    But for the Misrepresentations and Omissions, the Chapter 11 Trustee (with the support of the Lancelot and PBF Trustees) would not have consented to the assignment of the Acorn Claim to Greenpond.

209.    But for the Misrepresentations and Omissions, the Chapter 11 Trustee, the Lancelot Trustee and the PBF Trustee would not have agreed to the substantive consolidation of

the PCI and PGW estates, which allowed Greenpond to receive a distribution from the combined assets of those estates.

210.    But for the Misrepresentations and Omissions, the Chapter 11 Trustee, the other Plan Proponents, the US Trustee, and the creditors who voted for the PCI Plan would not have supported the PCI Plan, since it was based upon false information.

211.    But for the Misrepresentations and Omissions, this Court would not have approved of the PCI Disclosure Statement or confirmed the PCI Plan.

212.    Stern, on behalf of Greenpond, participated on the UCC and held himself out to be a fiduciary and a person of trust to his fellow UCC members.

213.    Stern, on behalf of Greenpond, signed the PCI Plan, approved the PCI Disclosure Statement in support of the PCI Plan, and otherwise held himself out to be a fiduciary and a person of trust to all the creditors of these Chapter 11 Cases as a Plan Proponent.

214.    Stern exploited his position of trust, made numerous false representations after fostering that trust, and willfully concealed material information to those to whom he owed a fiduciary duty to be transparent.

215.    Because of this willful misconduct, Greenpond and Stonehill gained an unfair advantage in the plan negotiation process that ultimately resulted in the allowance of the Acorn Claim against substantively consolidated estates.

216.    Stonehill has also unfairly benefited from the above described willful misconduct by continuing to prosecute the Varga Claim and attempting to extort a payout on the Varga Claim with the threat of expensive, protracted litigation and a delay in distributions to legitimate victims of the Petters Ponzi scheme, even though the PBF II Claim (the claim to which Varga agreed to limit his recovery) was allowed in full.

217.   The creditors of the PCI Estates have been damaged because of the Misrepresentations and Omissions and Defendants' willful misconduct.  These damages include, but are not limited to, the $40,000,000 held in reserve because of the Varga Claim that would otherwise be available for immediate distribution to holders of allowed claims.  The PCI Estates also entered into costly settlement agreements, like the settlement with Ark Discovery, based upon Defendants' Misrepresentations and Omissions. Creditors of the PCI Estates have also had to bear the burden of substantial litigation expenses associated with defending against the Varga Claim and pursuing this litigation.

218.   Greenpond has already received $7,836,886 in distributions from the combined assets of PCI and PGW—a distribution it received as a direct result of its misrepresentations and willful misconduct.

219.   Because of Greenpond's and Stonehill's misrepresentations and willful misconduct, Stern and Stonehill are now prosecuting a $720 million claim previously valued by all parties at $0.  Should the Varga Claim be allowed, Stonehill may receive up to $100 million in distributions on a claim that Greenpond and Stonehill originally agreed to being treated as worthless.

WHEREFORE, Plaintiff prays as follows:

A.   That  the Unassigned Acorn Claim be disallowed under 11 U.S.C. § 502(j);

B.   That Greenpond be required to disgorge all distributions it has received from the PCI Estates; and

C.   The Court award any and all such further relief as this Court deems equitable.

## THIRD CLAIM FOR RELIEF
## (BREACH OF FIDUCIARY DUTY AGAINST GREENPOND AND STERN)

220.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 219 as if fully set forth herein.

221.     As a member of the UCC and a Plan Proponent, both Greenpond, and its delegate, Stern, had a fiduciary duty to the creditors of the PCI Bankruptcy Cases.

222.     Greenpond's agent, Stern, knew that both Greenpond and he had a fiduciary duty to the creditors of these Chapter 11 Cases.

223.     As fiduciaries, Stern and Greenpond had duties of fairness, duties of candor, duties not to usurp the UCC's or the Trust Committee's opportunities for personal gain, duties to avoid engaging in transactions or dealings that might pose a potential conflict of interest without the UCC's knowledge, and duties to maintain the UCC's and the Trust Committee's confidential information.

224.     Greenpond and Stern breached their fiduciary duties by making numerous false representations—by word and action—and by omission and silence, as set forth in greater detail in the Misrepresentations and Omissions, as well as by acting in their own self-interest to the detriment of the true victims of the Petters Ponzi scheme.

225.     Defendants made the Misrepresentations and Omissions to induce the Chapter 11 Trustee, the other Plan Proponents, the US Trustee's office, this Court, two other United States Bankruptcy Courts (in Palm Beach and Chicago), and the victims of Petters' fraud into supporting confirmation of the PCI Plan, which, based upon what Plaintiff knows now, was premised upon patently false information.

226.     Only Greenpond, Stonehill—both represented and controlled by Stern—and Varga knew Stern's intent to prosecute the Varga Claim after confirmation of the PCI Plan.

227.   Stern and Varga willfully concealed that information to deceive and induce everyone's reliance upon the predicates underlying the PCI Plan—a general unsecured claim pool of approximately $1.9 billion with projected recoveries of approximately 10-14% and, more specifically, that the major creditors would receive an agreed upon percentage of that Claims pool.

228.   But for the Misrepresentations and Omissions, the Plan Proponents would not have permitted Stern to continue representing Greenpond on the UCC and would not have appointed Stern to the Trust Committee.

229.   As a member of the UCC and the Trust Committee, Stern had access to confidential and privileged information and communications—all of which Stern could have (and likely) used to the advantage of Greenpond and Stonehill in negotiating the PCI Plan.

230.   But for the Misrepresentations and Omissions, the Chapter 11 Trustee (with the support of the Lancelot and PBF Trustees) would not have consented to the assignment of the Acorn Claim to Greenpond.

231.   But for the Misrepresentations and Omissions, the Chapter 11 Trustee, the Lancelot Trustee and the PBF Trustee would not have agreed to the substantive consolidation of the PCI and PGW estates, which allowed Greenpond to receive a distribution from the combined assets of those estates.

232.   But for the Misrepresentations and Omissions, the Chapter 11 Trustee, the other Plan Proponents, the US Trustee, and the creditors who voted for the PCI Plan would not have supported the PCI Plan, since it was based upon false information.

233.   But for the Misrepresentations and Omissions, this Court would not have approved of the PCI Disclosure Statement or confirmed the PCI Plan.

234.    Stern, on behalf of Greenpond, participated on the UCC and held himself out to be a fiduciary and a person of trust to his fellow UCC members.

235.    Stern, on behalf of Greenpond, signed the PCI Plan, approved the PCI Disclosure Statement in support of the PCI Plan, and otherwise held himself out to be a fiduciary and a person of trust to all the creditors of these Chapter 11 Cases as a Plan Proponent.

236.    Stern exploited his position of trust, made numerous false representations after fostering that trust, and willfully concealed material information to those to whom he owed a fiduciary duty to be transparent.

237.    Because of this willful misconduct, Greenpond gained an unfair advantage in the plan negotiation process that ultimately resulted in the allowance of the Acorn Claim against substantively consolidated estates.

238.    Stonehill has also unfairly benefited from the above described willful misconduct by continuing to prosecute the Varga Claim and attempting to extort a payout on the Varga Claim with the threat of expensive, protracted litigation and a delay in distributions to legitimate victims of the Petters Ponzi scheme, even though the PBF II Claim (the claim to which Varga agreed to limit his recovery) was allowed in full.

239.    The creditors of the PCI Estates have been damaged because of the Misrepresentations and Omissions and Defendants' willful misconduct.  These damages include, but are not limited to, the $40,000,000 held in reserve because of the Varga Claim that would otherwise be available for immediate distribution to holders of allowed claims. The PCI Estates also entered into costly settlement agreements, like the settlement with Ark Discovery, based upon Defendants' Misrepresentations and Omissions.  Creditors of the PCI Estates have also had

to bear the burden of substantial litigation expenses associated with defending against the Varga Claim and pursuing this litigation.

240.    Greenpond has already received $7,836,886 in distributions from the combined assets of PCI and PGW—a distribution it received directly as a result of its misrepresentations and willful misconduct.

241.    Because of Greenpond's and Stonehill's misrepresentations and willful misconduct, Stern and Stonehill are now prosecuting a $720 million claim previously valued by all parties at $0.  Should the Varga Claim be allowed, Stonehill may receive up to $100 million in distributions on a claim that Greenpond and Stonehill originally agreed to being treated as worthless.

WHEREFORE, Plaintiff prays as follows:

A.    That the Court award general damages in an amount necessary to compensate Plaintiff for damages proven at trial;

B.    That the Court award punitive damages in an amount proven at trial;

C.    That the Unassigned Acorn Claim and the Varga Claim be equitably subordinated to all other claims in these Chapter 11 Cases or disallowed in their entirety pursuant to 11 U.S.C. § 510(c);

D.    That the Unassigned Acorn Claim be disallowed under 11 U.S.C. § 502(j);

E.    That Greenpond be required to disgorge all distributions it has received from the PCI Estates; and

F.    That the Court award any and all such further relief as this Court deems equitable.

**FOURTH CLAIM FOR RELIEF**
**(AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST STERN)**

242.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 241 as if fully set forth herein.

243.    To the extent Stern, himself, is not liable for breach of fiduciary duty, Stern knew of Greenpond's fiduciary duty to the creditors of these Chapter 11 Cases.

244.    Greenpond breached that fiduciary duty by engaging in the conduct detailed in the Misrepresentations and Omissions.   As Greenpond's delegate to the UCC and the Trust Committee, and as the manager of Greenpond, Stern possessed actual knowledge of such conduct.

245.    Stern substantially assisted and encouraged Greenpond's breach of its fiduciary duties.

246.    Stern's conduct has caused harm to the creditors of these Chapter 11 Cases, including, but not limited to, the $40,000,000 held in reserve because of the Varga Claim that would otherwise be available for immediate distribution to holders of allowed claims.  The PCI Estates has also entered into costly settlement agreements, like the settlement with Ark Discovery, based upon Defendants' Misrepresentations and Omissions. Creditors of the PCI Estates have also had to bear the burden of substantial litigation expenses associated with defending against the Varga Claim and pursuing this litigation

247.    Greenpond has received $7,836,886 in distributions from the combined assets of PCI and PGW—a distribution it received  as a direct result of its misrepresentations and willful misconduct.

248.    Because of Greenpond's and Stonehill's misrepresentations and willful misconduct, Stern and the entities he controls are actively pursuing a $720 million claim previously valued by all parties at $0.  Should the Varga Claim be allowed, Stonehill may receive up to $100 million in distributions on a claim that Greenpond and Stonehill originally agreed to being treated as worthless.

WHEREFORE, Plaintiff prays as follows:

A.    That the Court award general damages in an amount necessary to compensate Plaintiff for damages proven at trial;

B.    That the Court award punitive damages in an amount proven at trial;

C.    That the Unassigned Acorn Claim and the Varga Claim be equitably subordinated to all other claims in these Chapter 11 Cases or disallowed pursuant to 11 U.S.C. § 510(c);

D.    That the Unassigned Acorn Claim be disallowed under 11 U.S.C. § 502(j);

E.    That Greenpond be required to disgorge all distributions it has received from the PCI Estates; and

F.    That the Court award any and all such further relief as this Court deems equitable.

## FIFTH CLAIM FOR RELIEF
## (AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST VARGA)

249.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 248 as if fully set forth herein.

250.    Varga knew of Stern's and Greenpond's fiduciary duties to the creditors of these Chapter 11 Cases.

251.    Stern and Greenpond breached that fiduciary duty by engaging in the conduct detailed in the Misrepresentations and Omissions.  Varga possessed actual knowledge of such conduct.

252.    Varga substantially assisted and encouraged Stern's and Greenpond's wrongful conduct and breach of their fiduciary duties as set forth in the Misrepresentations and Omissions.

253.    Varga's conduct has caused harm to the creditors of these Chapter 11 Cases, including, but not limited to, the $40,000,000 held in reserve because of the Varga Claim that would otherwise be available for immediate distribution to holders of allowed claims.  The PCI Estates also entered into costly settlement agreements, like the settlement with Ark Discovery,

based upon Defendants' Misrepresentations and Omissions. Creditors of the PCI Estates have also had to bear the burden of substantial litigation expenses associated with defending against the Varga Claim and pursuing this litigation

254.    Greenpond has received $7,836,886 in distributions from the combined assets of PCI and PGW—a distribution it received as a direct result of its misrepresentations and willful misconduct.

255.    Because of Greenpond's and Stonehill's misrepresentations, willful misconduct, and breaches of fiduciary duty, with which Varga knowingly and actively assisted in violation of his own fiduciary duties to the PBF Estates and the Lancelot Estates, Stern and the entities he controls are actively pursuing a $720 million claim previously valued by all parties at $0. Should the Varga Claim be allowed, Stonehill may receive up to $100 million in distributions on a claim that Varga, Greenpond, and Stonehill originally agreed to being treated as worthless.

WHEREFORE, Plaintiff prays as follows:

A.    That the Court award general damages against Varga in an amount necessary to compensate Plaintiff for damages proven at trial;

B.    That the Court award punitive damages in an amount proven at trial;

C.    That the Court declare Varga's purported transfer of the Varga Claim to Offshore null and void; and

D.    That the Court award any and all such further relief as this Court deems equitable.

Dated: May 9, 2018

By: /e/ Joanne Lee
    Mark L. Prager, *Admitted Pro Hac Vice*
    William J. McKenna, *Admitted Pro Hac Vice*
    Joanne Lee, *Admitted Pro Hac Vice*
    Foley & Lardner LLP
    321 North Clark Street, Suite 2800
    Chicago, IL 60654-5313
    Telephone: (312) 832-4500
    Facsimile: (312) 832-4700

*-and-*

David E. Runck
Lorie A. Klein
FAFINSKI MARK & JOHNSON, P.A.
400 Flagship Corporate Center
775 Prairie Center Drive
Eden Prairie, Minnesota 55344

*Counsel for Douglas A. Kelley in his capacity as
Trustee of the PCI Liquidating Trust*